Robert C. Wheeler et al. [1] v. Commissioner. Wheeler v. Commissioner
Docket Nos. 43673-43676.
United States Tax Court
T.C. Memo 1955-138; 1955 Tax Ct. Memo LEXIS 201; 14 T.C.M. (CCH) 509; T.C.M. (RIA) 55138; May 27, 1955
*201 Richard Kilcullen, Esq., 233 Broadway, New York, N. Y., for the petitioners. William G. O'Neill, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These proceedings, consolidated for hearing and consideration, involve deficiencies in income taxes determined for the calendar years 1946 and 1947 as follows: Petitioner
1946
1947
Robert C. Wheeler
$7,117.87
$478.50
Wesley L. Wheeler
6,218.55
400.90
Howerd E. Wheeler
7,346.37
297.07
Eugene M. Wheeler
5,403.31
360.05
The issues to be decided are e81) whether debts resulting from loans made by petitioners to a corporation in which they were interested were worthless in 1946 and deductible as business bad debts; and, if so, whether a net operating loss from that year may be carried forward to 1947; and (2) whether petitioners sustained losses which were deductible in full in 1946 when a bank took over stock owned by petitioners and pledged to secure a bank loan to the above corporation. Findings of Fact Certain facts have been stipulated and are hereby found. About 1914, petitioner Howard Wheeler started in the boatbuilding business at the foot *202 of 23rd Avenue in Brooklyn on property belonging to a family named Noyes. The working capital for this business was supplied by members of the Noyes family. Petitioner Wesley Wheeler and an older brother, Lawrence, worked for their father, Howard, during the summer vacations and after school. Howard continued to operate this private boatbuilding business with the part time assistance of his sons until 1917. In that year he went to Washington and obtained a contract from the Navy to build 9 submarine chasers. Lawrence and Wesley began working full time for their father on that contract. Other Government contracts were received. The business continued in the individual name of Howard. Wesley and Lawrence continued to work full time and drew salaries which their mother placed in trust for them. Wesley went to night school to study naval architecture, ship drafting, and yacht design. In about 1919, there was a substantial delay in completing the then current contract because of a shortage of manpower and material, and the contract price was reduced by a penalty of $50 a day per boat for each day by which the contract delivery date was extended. At this point, Noyes withdrew his financial *203 support from the operation, taking the cash then available as payment for his capital and his rent for the property on which the work had been done. After the liquidated damages were deducted from the pending contracts the business was left with about $125,000 of accounts payable and a petition in bankruptcy was filed against Howard in 1919 or 1920. Howard made an arrangement with his creditors whereby he was permitted to take on and complete a contract with the Army for 24 mine yawls on the condition that he would issue his personal promissory notes dated into the future for the accounts payable and would apply against those notes all payments on the Army contract other than the small salaries being paid to Lawrence and Wesley. The notes were issued, the Army contract was completed and the profits were turned over to the creditors pursuant to the agreement. It was decided by Howard, Edith B. Wheeler, his wife, and Lawrence and Wesley that the only way to pay off the balance of the notes was to keep going in the boatbuilding business. Since the Noyes family insisted that the business be moved from the property at 23rd Street, the accumulated salaries of Lawrence and Wesley that *204 had been set aside in trust by their mother and a legacy received by her were used as a down payment on the purchase of new property on Coney Island Creek. Howard, Lawrence, and Wesley went to work full time building boats on that new property. Two younger brothers, petitioners Robert and Eugene, who were still in school, worked part time. During the war years the Wheeler family had lived together in the shipyard at 23rd Street. When the new yard was acquired, all members of the family contributed to the work at the yard, including Edith and two daughters. From 1920 to 1924, the yard built rowboats and small skiffs, and did miscellaneous millwork. By 1924, the yard was able to exhibit its first boat in a motorboat show, a 20-foot launch designed by Wesley and built mainly by members of the Wheeler family. Wesley had been given the job of transforming the Army blueprints on the mine yawls contract into full-size working drawings and has since designed substantially every boat bearing the Wheeler name. The business was operated as a family entity in the name of Wheeler Shipyard. Since the notes given by Howard were coming due at regular intervals, the funds of the business and the *205 real estate were kept in the name of Edith. Checks were signed by her individually. The living expenses of the family and the notes that had been issued by Howard were paid, as they came due or as funds were available, out of the earnings of this family business. In 1924, Wesley, Edith, and Lawrence filed in the Office of County Clerk, Kings County, New York, a certificate of doing business under the name and style of Wheeler Shipyard. This registration was on the advice of one of the banks with whom the family was then maintaining deposits. At the time this partnership registration was filed, some of Howard's notes were still outstanding. While all of those notes were eventually paid in full, the last notes were not paid until late in 1940 or 1941. There was no change in the operation of the business after the filing of this partnership certificate. The business continued to be run by Howard and until 1930 continued to operate under the name of Wheeler Shipyard. The yard did boatbuilding and boat repair work. Starting with one or two boats a year in 1924, by 1930 the yard was building about 75 boats a year. These boats included pleasure boats, work boats, and an occasional tug *206 or other special boat for one of the Government departments. The business was expanding and improving. There was considerable advertising and the Wheelers were developing a reputation. Additional land had been acquired; additional buildings put up. As of 1930, the plant covered about 30 acres, of which the total purchase price amounted to $90,000 and against which there was an open purchase money mortgage of about $65,000. The business was always short of working capital. The wartime earnings of Lawrence and Wesley and the inheritance of Edith had been put into the acquisition of the Coney Island property. Subsequent profits of the business were put back into the business. When additional money was needed, as for payrolls or other obligations, it was obtained on personal notes of Edith, Lawrence or Wesley, endorsed by the others. In about 1927, the Sheepshead Bay Bank, with whom the Wheelers had been dealing, offered to finance the construction of a steel and concrete shop. This loan was made on the personal notes of of members of the Wheeler family. The Sheepshead Bay Bank was subsequently taken over by the Brooklyn Trust Company, hereinafter sometimes called the bank, which continued *207 to finance the Wheelers on personal notes of one, endorsed by the others. In 1930, the mortgagee advised the Wheelers that he would like to sell the mortgage. The president of the Sheepshead Bay Bank advised the Wheelers that they should incorporate since it would make it easier for the mortgagee to sell or otherwise realize on his mortgage and since it would also make it easier for the Wheelers to prosecute a claim for change of grade against the city and keep straight the interests of the various members of the family. The whole family including the younger brothers, Eugene and Robert, were now working in the business. About September 4, 1930, the four petitioners together with Lawrence organized Wheeler Holding Corporation, a New York corporation with an authorized capital of 2,000 shares of stock at $100 par value. The same individuals were the initial directors and subscribers, each subscribing for 100 shares. About October 5, 1930, the same individuals organized Wheeler Shipyard, Inc., hereinafter sometimes called Shipyard, another New York corporation with an authorized capital of 10,000 shares of stock at $100 par value. The same individuals were the initial directors *208 and subscribers, each subscribing for 500 shares. The boatbuilding business as such was transferred to Wheeler Shipyard, Inc.; the physical assets were transferred to Wheeler Holding Corporation. Between October 5, 1930, and March 21, 1946, additional shares of Shipyard stock were issued against advances made by the stockholders on salary accrued but not drawn by the stockholders, and as of March 21, 1946, Howard owned 675 shares, Edith owned 625 shares, Wesley owned 784 shares, Eugene owned 780 shares, and Robert owned 803 shares. In 1942, Wheeler Holding Corporation was merged with Shipyard. About November 25, 1930, Wesley, Robert, and Eugene organized Playmate Sales Corporation, a New York corporation with an authorized capital of 500 shares of stock at $100 par value. The four petitioners and Edith were the initial directors and subscribers, each subscribing for 100 shares. This company was to take over the sales operations. Both before and after the incorporation of these companies petitioners practically designed, built, sold, tested, and delivered to the owners, private or Government, substantially every Wheeler boat, the 2,247th such boat being in construction at the time *209 of trial. Beginning about 1936, the Wheelers began to discount their customers' obligations through the Bankers Commercial Company. On such discount transactions the customers' notes were personally endorsed by the Wheelers and, in addition, the Wheelers personally agreed to repossess the boat and pay the bank on the purchaser's default. In 1940, Shipyard bid on a Coast Guard contract for 40 boats, the aggregate contract price being about $1,900,000. In awarding that contract to Shipyard, the Coast Guard requested and received the personal assurance of the individual members of the Wheeler family that the boats would be delivered. Performance of the contract was financed by the bank on the basis of personal endorsements by the individual members of the Wheeler family. Subsequent contracts obtained by Shipyard were performed by the Wheelers through Shipyard on the basis of financing supplied to the company by the bank on endorsements and guaranties of the individual Wheelers. In 1941, Eugene was asked by the Navy Department whether the Wheelers could take on a contract for 136-foot mine sweepers. The Shipyard plant was inadequate for construction of boats of that size, and the *210 Wheelers discussed with the bank the acquisition of a new shipyard. They also discussed with the bank the financing of such a contract and were advised that Shipyard had already borrowed up to its legal debt limit and that such financing could only be given to a new entity. The bank notified the Navy that it would be unwilling to finance Shipyard on such a contract. Petitioners, nevertheless, bid on the mine sweeper contract and were awarded a contract aggregating over $4,000,000 for 16 boats. The telegram of award was addressed to Wheeler Brothers, Brooklyn. After receipt of the contract, the Wheelers again approached the bank and persuaded it to finance the acquisition of a new yard after convincing the bank that they could successfully divide their individual energies and abilities between 2 yards. A new corporation, Wheeler Shipbuilding Corporation, hereinafter sometimes called Shipbuilding, was organized to permit the bank to avoid the legal debt limit with respect to Shipyard. Shipbuilding, a New York corporation with authorized capital of 1,000 shares of stock of no-par value, was organized on April 11, 1941. Eugene, Robert, Lawrence, and Wesley were the original directors *211 and officers and each was issued 125 shares of stock with a stated value of $300 per share. No other stock was ever issued. Loans made by the bank to Shipbuilding to finance this contract were personally guaranteed by the individual Wheelers. In the early part of 1942, the Navy proposed that the Wheelers take on the purchase of materials for the entire mine sweeper program. They refused to take on such a commitment in Shipyard, feeling that it might interfere with the building operations of that company, but offered to form a new company or partnership. This proposal was accepted, and petitioners, on May 23, 1942, filed a partnership certificate with the County Clerk of Queens County, New York, in the name of Wheeler YMS Purchasing Company. Initial financing of this partnership was by the bank on the personal notes of the partners. A million dollars was subsequently advanced by the Navy to the partnership, which bought approximately 135 items for the mine sweeper program and spent approximately $40,000,000 worth of Government and contractors' money. During the war period, further contracts were obtained and completed by Shipyard and Shipbuilding for the Army, Navy, Coast Guard *212 and War Shipping Board. The decision as to which corporation would enter into a particular contract and as to the yard at which a particular contract should be performed was made by the Wheelers. Altogether, between 400 and 500 ships were built, ranging from 26 to 186 feet, including 176-foot steel vessels for the Army. All of this building was financed by advances or progress payments by the Government and by the bank on the personal endorsements and guaranties of the Wheelers. In the case of the Army contract, the Government advances were in the form of a trust deposit personally guaranteed by the individual Wheelers. With the completion of the final Government contracts in 1945, the Wheeler companies had discharged all their obligations to the banks and the individual Wheelers had been released from their guaranties and endorsements. At that time the corporations could have been liquidated, and the individual Wheelers could have received approximately one-half million dollars each. At the insistence, primarily of Howard and Edith, neither of whom was a stockholder in Shipbuilding, it was determined to continue the operation of that company. Howard wanted to continue the Wheeler *213 name in the boatbuilding business. At that time this was the only operating company. Shipyard, although still in existence, had sold its physical assets in 1945 because Coney Island Creek, on which that company's yard was located, had so filled with mud that the operation of a shipyard at that site was no longer practicable. The Wheelers decided to resume pleasure boatbuilding at the Shipbuilding yard. Despite the investment of about $4,000,000 in that yard during the wartime period, new facilities were required, and a loan of $3,000,000 was requested from the bank. After several months of negotiation, the bank, on March 21, 1946, entered into a revolving credit agreement with Shipbuilding under which it agreed to advance up to $2,000,000 to that company until November 30, 1946. At the same time, Wesley, Eugene and Robert executed an agreement with the bank guaranteeing any and all obligations of Shipbuilding and they, together with Howard and Edith, deposited stock to secure that guaranty. Wesley, Eugene and Robert each deposited 125 shares of Shipbuilding. Howard deposited 675 shares, Edith 625 shares, Wesley 784 shares, Eugene 780 shares, and Robert 803 shares of Shipyard. *214 In addition to the guaranty and deposits, from January 31 to March 21, 1946 Wesley advanced $23,000, Eugene advanced $52,500, and Robert advanced $44,500 to Shipbuilding. These advances were subordinated, pursuant to a subordination agreement dated March 21, 1946, to the loans made by the bank under the revolving credit agreement. From August 23, 1946 to October 17, 1946 Wesley advanced $52,158.86, Eugene advanced $23,500, Robert advanced $24,703.01, and Howard advanced $50,028.74 to Shipbuilding. Operation of the pleasure boatbuilding business proved difficult by reason of strikes and shortages of steel necessary to construct the new buildings required. The bank began to consider salvage possibilities in October or November 1946, and at that time expected to realize approximately 25 to 30 cents on the dollar. In November 1946, the bank determined that it would neither extend the loan nor advance additional funds and called the loan as due on November 30, 1946. Advances at that time under the revolving credit agreement amounted to $2,000,000. The bank also gave notice to all parties that the pledged stock would be taken over under the terms of the loan guaranty. The pledged stock *215 certificates had been carried in the bank's portfolio with the necessary stock powers assigning the stock to the bank. When pledged securities are taken over in this manner no credit on the loan is given until the bank receives value for the pledged securities because there is no establishment of value at the time the pledged securities are taken over physically. About December 13, 1946, Shipbuilding, by its president, Wesley, filed a petition under Chapter XI of the Bankruptcy Act in which petition it admited that it was unable to pay its debts as they matured. The petition listed the assets of Shipbuilding at a net value of $4,125,819.06 and listed claims against Shipbuilding in the net amount of $3,840,439.68. About May 8, 1947, Shipbuilding was adjudged a bankrupt. A tentative financial report as of November 30, 1946 showed assets of $3,518,594.97 and liabilities of $3,748,800.02. At the time Shipbuilding filed its petition in bankruptcy, petitioners and their accountants expected that the dividend to creditors would be approximately 25 per cent. During the year 1947, the following claims against Shipbuilding were filed with the Referee in Bankruptcy: The bank
$1,942,952.24
The bank as assignee [2] of: Wesley
33,730.28
Robert
55,012.96
Eugene
63,338.96
Howard
10,512.92
Wesley
52,125.68
Robert
24,703.01
Eugene
23,490.26
Howard
50,008.14
*216 *217 Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Wesley L. Wheeler, Docket No. 43674; Howard E. Wheeler, Docket No. 43675; and Eugene M. Wheeler, Docket No. 43676.↩
2. The amounts claimed by the bank as assignee included accrued salary owed to the assignors as well as the advances designated in the subordination agreement. The accrued but unpaid salary, not claimed as a deduction in these proceedings, is as follows: Wesley $10,730.28
Robert 10,512.96
Eugene 10,838.96
Howard 10,512.92 The assets of Shipbuilding were liquidated by the Trustee in Bankruptcy during the years 1947 to 1950. The general creditors received a first and partial dividend on April 4, 1949 in the amount of 17 1/2 per cent of their approved claims, and received a second and final dividend on May 3, 1950 representing 14.62093 per cent of their approved claims. About January 22, 1948, the bank began an action against Wesley, Eugene, and Robert to recover $1,678,585.36 under the guaranty executed by those petitioners. They filed an answer, including counterclaims of $5,800,000, and the action was settled on or about April 1, 1949. As a part of that settlement, the bank released Wesley, Eugene, and Robert from any claim under the guaranty, thus making it possible for them to receive the dividends on their unsubordinated advances. Wesley, Robert, Eugene, and Howard received dividends on their personal claims against Shipbuilding on December 13, 1949, and May 22, 1950. The Shipyard stock held by the bank as security for its advances under the revolving credit agreement was, on February 20, 1947, transferred to its nominee who held the security in the same manner as the bank had held it. At or about the time the Shipbuilding was adjudged a bankrupt, liquidation of the assets of Shipyard was begun. The nominee received the following liquidating dividends with respect to the 3,667 shares of capital stock of Shipyard: June 4, 1947
$220.020.00
May 6, 1948
165,015.00
May 9, 1949
25,669.00
May 23, 1950
22,047.50
Total
$432,751.50 These liquidating dividends were then applied as credits to the loan account of Shipbuilding. The basis of the petitioners of the Shipyard stock deposited by them and liquidated by the bank for its own benfit was as follows: Wesley
$63,155.30
Robert
64,699.18
Eugene
62,832.17
Howard
54,394.71
Wesley never built boats for sale other than through the entities created by petitioners. During the years 1932 to 1940 he never operated as an individual naval architect for other shipyards. During 1940 to 1946, all of his efforts were directed towards turning out boats through Shipyard and Shipbuilding. None of petitioners maintained offices separate from those of Shipyard and Shipbuilding, nor ever had employees separate from the employees of Shipyard and Shipbuilding, nor ever kept books and records except for personal records separate from the books and records of Shipyard and Shipbuilding. None of petitioners was in the business of lending money. During the years 1930 to 1946, all boatbuilding activities were confined to the entities created for that purpose. When advertising was placed to promote the sale of boats, the name and address of the entity then in existence would be contained in the advertisement, that entity was billed for the amount due, and correspondence concerning the advertising could be addressed to that entity. The boats advertised were those manufactured by the entities. The names of the individual Wheelers never appeared in advertisements. After the bankruptcy, the property of Dawn Cruisers, Inc. at Clason Point, in the Bronx, was deeded to Lawrence, and petitioners there began the construction of pleasure boats on a small scale. The operations at that yard were conducted as a partnership in the name of Wheeler Shipyard Company. Later, the name was changed and operations continued, still in partnership form, under the name Wheeler Yacht Company. About October 5, 1950, petitioners organized Wheeler Boat Company, Inc., a New York corporation with authorized capital of 100 shares of stock at no-par value. They were the stockholders and directors of the company. This company was organized to bid on Navy contracts at the beginning of the Korean war and did obtain and perform one such contract as a joint venturer with Freeport Point Shipyard, Inc. of Freeport, Long Island. Since 1947, there have also been organized a partnership known as Wheeler Shipyard Sales, organized by Wesley, Eugene, and Robert in January 1950; Wheeler Shipyard Company, a partnership organized by Wesley, Eugene, and Robert in Nassau County in January 1950; Wheeler Yacht Corporation by Wesley, Eugene and Robert in New York on February 13, 1951; and Wheeler Yacht Corporation by Wesley, Eugene, and Robert in Connecticut about August 1, 1952. Each of these latter partnerships and corporations was formed to carry on some particular function of the general boatbuilding business being conducted by the Wheelers at the Clason Point yard. From 1924 through 1953, except in those years when no show was held, at least one Wheeler boat has been exhibited in the motorboat show each year including the year following the bankruptcy of Shipbuilding when Wesley designed and with seven men physically built at the new Bronx plant a Wheeler showboat. In some years as many as 10 Wheeler boats were exhibited. During the same period, one or another of the Wheelers or Wheeler entities has been a member of the National Association of Engine and Boat Manufacturers, and Wesley, at the time of trial, was a member of the Executive Committee of that Association. Since 1924, Wheeler boats have been nationally advertised as such, although the particular entity placing that advertising has varied. Wheeler boats for this period have had continuing distinctive features. During the same period Wheeler boats have been continuously associated in the trade and in the public mind with the Wheeler family rather than with any particular organization or entity. In the construction of those boats, the individual members of the Wheeler family have personally and physically designed the boats, built or supervised the building of them, sold them and tested them. They have performed their specific jobs without regard to the particular entity from time to time employed and without regard to stock ownership or membership in the particular entity employed. In making its advances, first to Shipyard and then to Shipbuilding, the bank not only required the personal guaranties of the individual members of the Wheeler family and the deposit of their personal assets, but relied on the ability of the individual Wheelers to build boats and to run a boatbuilding business. Officers of the bank personally investigated the operations of the yard and the boatbuilding capacities of the Wheelers. In awarding contracts to one or another of the Wheeler entities, the Army, Navy and Coast Guard relied upon the ability of the individual Wheelers to build the boats called for, and did not rely merely upon the financial capacity of the particular entity to which the contract was awarded. Petitioners have from time to time financed by way of advances and guaranties the operation of the various entities employed in building Wheeler boats. They have individually paid debts of one or another of these entities, they have guaranteed the borrowings of these entities, they have guaranteed payment of suppliers of these entities, and have guaranteed delivery of Wheeler boats to both private and Government customers of these entities. Opinion It is now settled that a debt will not be a "business bad debt" merely because of its relation to some business. The business must be that of the taxpayer and it will not suffice for the debt to be incurred on account of the business of some other legal entity such as a corporation even though the taxpayer may be a stockholder or officer. In such a situation, the business giving rise to the obligation is considered to be different from any business carried on by the individual. , affirmed per curiam (C.A. 3) ; . Of course the taxpayer may have a business separate from and beyond the business of any of his corporations. In that class fall the "promoter" or "money lender" cases where the activity of the individuals in organizing, financing or investing in numerous activities has become an occupation in its own right. Cf. , , with (May 18, 1955), , and , revd. (C.A. 2) , certiorari denied . Here petitioners make no contention for and the record does not support the view that what these individuals did was by itself a promoting business. They contend that they were at all times in the "shipbuilding business." But as we have seen, to the extent that this business was carried on by means of the corporate form, petitioners cannot successfully claim that the debts incurred were business bad debts. See Petitioners had an investment in their various corporations which could by means of sale or worthlessness give rise to a capital loss. The advances had their source in and were presumably motivated solely by the interest which petitioners already held as investors in the corporate business. It does not change its nature that their additional investments took the nominal form of loans or guaranties in an attempt to salvage their capital investment. See (April 29, 1955); (January 31, 1955). Separate consideration must be given to claimed losses resulting from a guaranty by petitioners of the corporation's liability. Against some factual backgrounds losses have been allowed where the necessity has arisen of making good on a guaranty of the obligation of an insolvent debtor. ; . We need not, however, determine whether the financial condition of their corporation and its continued existence would make it possible to extend the benefits of the loss deduction to these petitioners. ; ; ; cf. , reversing , but see . The only means by which any loss could have been sustained was through the application by the creditor-bank of stock belonging to petitioners and delivered as security for the performance of the guaranty. The difficulty is that no action by the creditor in the tax year 1946 was sufficiently definitive to constitute a taxable event fixing petitioners' losses in that year. , affd. (C.A. 6) ; , certiorari denied . Not only was there no sale of the stock in 1946 but no action is shown by this record constituting even a tentative application of the stock to the indebtedness until February 1947 at the earliest. And petitioners make no claim that this was a loss arising in 1947. It follows that treatment of the guaranty and the dealings with respect to petitioners' pledged stock is required to be no different from that relating to the remainder of their claims. We have not passed on the question advanced by respondent as the primary issue. Whether any indebtedness resulting from advances to the corporation became worthless in 1946 or in 1947, the result here would have to be the same. As we have said, the direct advances to the corporation were at best nonbusiness bad debts and their deductibility narrowly confined by the statute and properly treated by respondent; and any loss on the guaranties did not take place in the year when the loss is claimed. While the year 1947 is before us no contention is made, for whatever reason, that bad debts or losses became fixed in that year. It may even be that the debts in question were worthless only in part as petitioners alternatively contend and, if so, that they continued to be deductible until the final payment on account was made in a later year and the balance became irretrievable. . But these are phases of the controversy which, while puzzling, need not now be decided. They may safely be left to any future controversies to which further developments may give rise. Decisions will be entered for the respondent. ↩